**STATE OF VERMONT**

**ENVIRONMENTAL COURT**

Vermont Environmental Board,
Plaintiff,                                    }
                                              }
v                                             }          Docket No. 96-5-02 Vtec
                                              }
Allen Road Land Co., Inc and                 }
John Larkin, Respondents

**Decision and Order**

On April 23, 2002, the Chair of the Vermont Environmental Board (the Board) issued an administrative order pursuant to 10 V.S.A. ' 8008 regarding Respondents, who timely requested a hearing in Environmental Court. The Environmental Board is represented by Thomas G. Walsh, Esq.; Respondent Allen Road Land Co., Inc., and its president Respondent John Larkin, are represented by Carl H. Lisman, Esq. As necessary to distinguish between the Respondents, we will refer to them in this decision as Respondent Company and Respondent Larkin.

The Court extended the time for the hearing for good cause at the request of and by agreement of the parties to allow motions to be decided in advance of trial. The parties also agreed to bifurcate the hearing, so that all that is before the Court at the present time is the question of whether any violations occurred, and whether any remedial order is necessary regarding the permitted hours of operation. The parties agreed that a hearing on whether any penalty is warranted should be postponed until after the question of violation is resolved.

The statutes, rules and permits applicable to this matter are 4 V.S.A. Chapter 27; 10 V.S.A. Chapter 151 (Act 250); 10 V.S.A. Chapter 201; and Land Use Permit (Act 250 Permit) No. 4C1060-EB and 4C1060. 10 V.S.A. ' 8012(c)(2).

Findings

Respondent Larkin signed the Act 250 permit application for the Irish Farm Development at issue in this case, signing both as Applicant and as Landowner. Deborah Sherman is the Project Manager[1] for the Irish Farm Development. She is employed by Respondent Company and reports directly to Respondent Larkin. She visited the Irish Farm Development on an approximately daily basis from the time that site work began there in the spring of 1991 at least to the time of trial.

The Act 250 Permit issued by the Board defines the project as the subdivision of a 28.21 acre parcel (known as Parcel C) on Allen Road in South Burlington to create 32 single-family residential lots and one lot (Lot 36) with six residential duplex structures (also described as 12 multi-family units), to be served with municipal water and sewage facilities, plus three additional lots: Lot 35 to be retained by Respondent Company, Lot 33 proposed as open space, and Lot 34 to be dedicated as a city park. The project includes new roadways to be dedicated to the City and a stormwater system including three detention basins to be maintained by the homeowners= association.

The permittee is required by the Board= s decision to A complete, operate and maintain @ the project in accordance with the terms and conditions of both the Act 250 Permit as issued by the District Commission and the Act 250 Permit as issued by the Board, with the plans and exhibits

on file with the Board and with the conditions of the Board= s permit. In turn, the District Commission= s permit requires that the project be A completed, operated and maintained@ in accordance with the Commission= s Findings of Fact and Conclusions of Law, with the plans and exhibits on file with the Commission, and with the conditions of the Commission= s permit. The permittee of the District Commission= s permit is shown on its cover page as the Respondent Company, by its president Respondent Larkin. The permittee of the Environmental Board= s permit is shown on its cover page as Respondent Company, by its attorney Carl H. Lisman, Esq.

Respondents proposed in the application that Respondent Company would construct the multi-family structures but that the undeveloped subdivided lots would be sold to individual homeowners to construct single-family homes of their own design, limited by the permit application and approval as to specific building envelopes and water demand and sewage flow (as limited by number of bedrooms allowed). Other than those limitations, the design and construction specifications of the single-family houses were not submitted for approval as part of the project application, as contrasted with those for the multi-family buildings.

Construction on the Irish Farm Development began in mid-March of 2001. From time to time in April and May 2001 at lease two residents of the neighboring Harbor Heights and Bay View Drive areas observed that work on the roads and infrastructure occurred on weekdays after 5:00 p.m. until as late as 6:00 or 7:00 p.m., and on some weekends, but neither kept a log recording the specific dates or times of these observations during those months. The Administrative Order at issue in this case alleges a violation involving work outside the standard hours of operation on March 28, 2001, but no evidence was presented or findings requested specific to that date.

S.D. Ireland Brothers Corporation (S.D. Ireland Brothers) and S.D. Ireland Concrete Construction Corporation (S.D. Ireland Concrete) are related corporations. S.D. Ireland Brothers Corporation is the excavation and earthmoving company with which Respondent Company contracted for the site work, road construction, and to install the utility infrastructure at the Irish Farm Development, including to dig the foundation holes for the duplex buildings. S.D. Ireland Concrete Construction Corporation is the concrete construction company with which Respondent Company contracted to install the concrete curbs along the roadways and to install the concrete foundations, basement floors and curbs needed for the duplex buildings. Observers unfamiliar with the corporate structure will not necessarily differentiate between them and may perceive and refer to both as A S.D. Ireland.@

Mr. Tim Cole is a vice-president and was the project manager for S.D. Ireland Brothers for the work performed at the Irish Farm Development from the spring of 2001 to the time of trial. From the time S.D. Ireland Brothers began work in March 2001 until Mr. Cole received an email regarding the limited hours of operation from a neighbor on May 11, 2001 (regarding her observations of work beyond those hours on May 10, 2001 and before), the workers and equipment would show up at the job site between about 6:30 a.m. and 7:00 a.m. to be ready to start work at 7:00 a.m., and would routinely work until 7:00 or 8:00 p.m. Prior to May 11, 2001, Mr. Cole may have received a copy of the Irish Farm Development= s Act 250 Permit but Respondents had not specifically informed him of the time limitations on the activities of S.D. Ireland Brothers and had not made those time limitations an element of any contract involving S.D. Ireland Brothers.

As of May 11, 2001, Mr. Cole and hence S.D. Ireland Brothers Corp. was aware of the limited hours of operation imposed by the Act 250 Permit for the project. Shortly after that date, Mr. Cole discussed the hours of operation with Ms. Sherman, Project Manager for Respondent Company, who told him that it was acceptable under Respondent Company= s understanding of the permit limitations for S.D. Ireland Brothers to continue for an undefined > short time= after 5:00 p.m. > if necessary= to > button up= the site at the end of a work day.

Mr. Scott Ireland is the president of S.D. Ireland Concrete Construction Corporation. Respondents had not specifically informed him of the time limitations on S.D. Ireland Concrete= s activities at the Irish Farm Development and had not made those time limitations an element of any contract involving S.D. Ireland Concrete. At some time after June 12, 2001 and before July 28, 2001, Mr. Cole made Mr. Ireland, and hence S.D. Ireland Concrete, aware of the Monday through Friday, 7:00 a.m. to 5:00 p.m. time limitations in the Act 250 Permit. Mr. Scott Ireland testified that S.D. Ireland= s workers > worked diligently= to try to abide by the time limitations in 2001.

Concrete work is to some extent dependent on the weather, as concrete sets up more quickly on a sunny day and sets up more slowly but makes a better product on a cloudy day. S.D. Ireland Concrete routinely obtains weather radar updates every ten minutes, as the anticipated weather is critical to its operations. Concrete curbs must be cut within 24 hours of being poured, to avoid cracking. The cutting of concrete curbs is an operation that creates extremely loud noise. Concrete floors and slabs must be buffed with machines before the concrete is completely set up, to properly finish the surface. Mr. Scott Ireland on behalf of S.D. Ireland Concrete made specific decisions about when to pour concrete, and when to buff or cut concrete, without consultation on any day-to-day basis with Respondents= representatives.

On Monday, June 11, 2001, S.D. Ireland Concrete performed concrete work pouring foundations at Lot 36 of the duplexes, including the noise of trucks backing up and concrete being poured, until 6:30 p.m.

On Tuesday, June 12, 2001, S.D. Ireland Concrete performed concrete work pouring foundations at Lot 36 of the duplexes, including the noise of trucks backing up and concrete being poured, until 6:15 p.m. On that date, Tim Cole of S.D. Ireland Brothers told a neighbor that the excavating > division= of S.D. Ireland knew of the limitations on hours of operation but that the concrete > division= did not then know of the limitations on the hours of operation.

On Thursday, June 21, 2001, S.D. Ireland Concrete performed concrete work at Lot 36 of the duplexes, smoothing and buffing concrete pads until after 5:00 p.m.

On Thursday, June 28, 2001, S.D. Ireland Concrete performed concrete-related work at Lot 36 of the duplexes, including the cutting and removing of the plywood forms for the concrete foundations and pads, until 8 p.m.

On Saturday, July 28, 2001, S.D. Ireland Concrete performed saw cutting of concrete curbs, an extremely loud outdoor operation, made necessary by S.D. Ireland Concrete= s having poured the concrete curbs the previous day.

On Saturday, August 11, 2001, workers from a roofing subcontractor worked at the duplex buildings at Lot 36 during the day and were observed by a neighbor at approximately 4:00 p.m. packing up their materials.

On Sunday, August 12, 2001, workers from a roofing subcontractor began work at 7:05 a.m. hammering nails on a roof of the duplexes at Lot 36. On that date, after inquiry by a neighbor, the roofing subcontractor supervising the job stated that he had not been aware that the permit contained restrictions regarding weekend work, and stopped work.

On August 27, 2001, the District Coordinator for District 4 sent a Notice of Alleged Violation to Respondent Company asserting as the violation A ongoing construction activities outside of the standard hours of operation.@ It did not explicitly direct Respondent Company to take any action other than to A recommend that you immediately cease and desist any further construction activity that is outside of the approved work limits.@ It warned that the Environmental Board

might take additional enforcement action, and that > prompt correction= of the alleged violation is a factor considered by the Board in determining the appropriate enforcement action. According to that District Coordinator, the mere arrival or departure of workers outside the 7 a.m. to 5 p.m. hours would not have been considered a violation.

Shortly after receiving the Notice of Alleged Violation, Ms. Deborah Sherman, Respondents= Project Manager, telephoned the District Coordinator to discuss the Notice of Alleged Violation and the permit conditions. She reported the discussion to Respondent Larkin. Ms. Sherman= s understanding from this conversation was that Respondents were entitled to have quiet indoor work done on weekend, and that, if circumstances prevented a particular day= s work from being completed by 5 p.m., it could be completed within a A reasonable time@ thereafter. The District Coordinator intended, by a A reasonable time,@ to convey the concept of fifteen minutes or so. After the issuance of the Notice of Alleged Violation, the District Coordinator did not receive any more complaints regarding this project for about two months.

Based on her understanding, after this discussion, of the limitations on working hours imposed by the permit conditions, Ms. Sherman authorized a drywall contracting company and an individual painting contractor to perform work inside the duplexes on weekends. On Saturday, September 15, 2001; Sunday, September 16, 2001; Saturday, September 22, 2001; and Sunday, September 23, 2001 workers from the drywall contractor worked indoors at the duplex buildings on Lot 36. Neighbors did not hear construction noises from their homes, but did hear the workers= voices, radios, and the arrival of the workers= vehicles.

On Saturday, October 13, 2001, workers from Yankee Plumbing were working indoors at the duplex buildings on Lot 36. Neighbors observed the truck parked outside but did not hear noise from the interior plumbing work.

Also on Saturday, October 13, 2001, workers were doing outside framing work on a single-family house on Lot 3 at about 10:00 a.m. After inquiry by a neighbor who showed them the Notice of Alleged Violation, the workers agreed to leave. As of that date, Lot 3 was no longer owned by Respondents.

In November of 2001, the District Coordinator met with Respondent Larkin on site to discuss an unrelated issue regarding tree removal, and at that time reminded him of the hours of operation. Throughout the fall and winter of 2001, the individual painting contractor and workers from the drywall contractor worked routinely indoors on weekends. Neighbors did not hear construction noise from the weekend work, but did hear the arrival of the workers= vehicles.

For about a week in January 2002, when the weather was relatively mild, a stone mason applied stone facing to some exterior walls of the duplex buildings on Lot 36. The stone facing was applied with cement mortar, which had to be maintained above a specific temperature in order to cure properly. To maintain the facing above the required temperature, the mason erected a plastic barrier around the work area and installed an electric-powered heater within the enclosed space, which had a fan and was governed by a thermostat that cycled the heater on and off to maintain the required temperature. The sound of the heater cycling on and off during the nighttime hours was audible from the nearby residences.

S.D. Ireland Concrete returned to the project site to do concrete work at the duplexes on Lot 36 in April, 2002. Mr. Scott Ireland testified that by that time he had forgotten about the limits on hours of operation at the project discussed the previous summer.

On Friday, April 19, 2002, S.D. Ireland Concrete performed concrete work pouring foundations at Lot 36 of the duplexes (Building 3) until 6:00 p.m., including the use of several trucks.

On Saturday, April 20, 2002, S.D. Ireland Concrete performed concrete work pouring foundations at Lot 36 of the duplexes, beginning at 6:40 a.m. and using a truck and a cement mixer. The work continued for about a half day.

On Tuesday, April 23, 2002, S.D. Ireland Concrete performed concrete-related work at Lot 36 of the duplexes, including removing the plywood forms for the concrete foundations, until 5:30 p.m.

On Wednesday, April 24, 2002, S.D. Ireland Concrete performed concrete work pouring foundations at Lot 36 of the duplexes (Building 4) until 6:50 p.m.

On Thursday, April 25, 2002, S.D. Ireland Concrete performed concrete-related work at Lot 36 of the duplexes, including removing the plywood forms for the concrete foundations, until 5:50 p.m., including the use of two large trucks.

On Saturday, April 27, 2002 and Sunday, April 28, 2002, workers performed indoor construction work all day at the duplex buildings on Lot 36 (Buildings 3 and 4). A neighbor could hear pounding noises from his property, including inside his residence, and also heard the arrival of the workers= vehicles at 6:15 a.m. on Saturday.

On Saturday, May 4, 2002, and Sunday, May 5, 2003, workers from the drywall contractor worked indoors at the duplex buildings on Lot 36 (Buildings 2 and 3). Neighbors did not hear construction noises, but did hear the workers= voices as they went in and out of the buildings and heard the arrival and departure of the workers= vehicles.

Also on Saturday, May 4, 2002, an excavation company began work at 9:30 a.m. for the driveway of a single-family house on Lot 28, continuing until 4:00 p.m. with a backhoe and dump truck. As of that date, Lot 28 was no longer owned by Respondents, and the Environmental Board= s attorney stated at trial that the Board no longer wished to pursue this asserted violation.

On Monday May 6, 2002, workers with a delivery truck unloaded materials at the duplex buildings on Lot 36 (Building 5) at 6:30 a.m., using a forklift, and also unloaded materials at Lot 29. As of that date, Lot 29 was no longer owned by Respondents.

On Wednesday, May 29, 2002, a worker from the drywall contractor arrived for work at the duplex buildings on Lot 36 (Building 4) at 5:30 a.m. Neighbors did not hear construction noises before 7 a.m., but did hear workers= voices and the arrival of the workers= vehicles.

No evidence was presented regarding circumstances, such as weather conditions or any other circumstances, requiring outdoor work to continue beyond 5 p.m. or to be done on weekends, other than the curb cutting on Saturday, July 28, 2001, and the fact that the temperature was cold in January during the week of stone facing work. As to the curb incident, Respondents= witnesses did not explain whether any unavoidable circumstances required them to pour the curbs on the Friday, knowing that the cutting would therefore have to be done on a Saturday.

Conclusions as to Violation (10 V.S.A. ' 8012(c)(1)):

The statute requires this Court to determine whether a violation has occurred, 10 V.S.A. ' 8012(b)(1), independently of reviewing and determining anew a penalty amount. 10 V.S.A. ' 8012(b)(4). We determined as a matter of law in the June 24, 2002 decision that the Board does not allege as a violation that Respondents failed to obtain a permit amendment for the work done outside the > standard hours of operation= ; therefore that issue is not before the Court in the present case.

As Respondent Larkin signed the Act 250 permit application both as Applicant and as Landowner, by so doing he subjected himself individually to the conditions of any permit[2] that would be issued based on the application.

We determined as a matter of law in the June 24, 2002 decision that the permit requirement that the project be constructed in accordance with the application <u>did</u> impose on the Permittee, that is, on Respondent Company, the enforceable hours of 7 a.m. to 5 p.m., Monday through Friday, during construction (at least for outdoor site work and construction on the three retained lots, on the multi-family buildings, and on the infrastructure and roadway installation and associated construction and landscaping), because those are the hours proposed by the applicant as the hours of operation during construction.

<u>Violations alleged on Individual Lots</u>

Act 250 permits make a developer responsible for the completion of the project according to the permit application and conditions. Thus, a developer may remain responsible for, <u>e.g.</u>, the maintenance and replacement of street trees in a subdivision, or the size and contours of the streets or drainage ditches, even after the individual lots are sold. Act 250 permits authorizing residential subdivisions also routinely impose limitations on what can be built by lot purchasers on the individual lots, depending on what has been applied for in the application. For example, the individual lots in the Irish Farm Development are limited to having single-family houses built upon them, not duplexes or retail stores or gasoline stations. The houses are limited to a certain sewer and water capacity and a certain building envelope. The limitations or conditions of the Act 250 permit are imposed on successor owners of the property as provided in the permit, and the developer is required to record the permit in the land record and may be required to place language in the deed informing the owners of the conditions.

Thus, the successor owners of individual house lots may be required under the permit to comply with the permit conditions at issue in this case as to hours of construction undertaken on their individual houses, just as individual lot owners may be required to comply with maintenance of a minimum level of landscaping on their lots, or with a condition requiring certain types of plumbing fixtures or no more than a certain number of bedrooms. However, the fact that a successor owner is responsible for compliance with the conditions of a permit does not necessarily make the original developer the guarantor in perpetuity of the successor owners= compliance. At some point, informing the individual lot owners of their responsibilities under the permit and performing all of the developer= s responsibilities under the permit is sufficient as to any individual lot.

Accordingly, the violations alleged on October 13, 2001 on Lot 3 (roofing hammering on a Saturday) and on May 6, 2002 on Lot 29 (materials delivery between 6:30 and 7:00 a.m.), as well as the one on May 4, 2002 on Lot 28 (driveway excavation on a Saturday) that was withdrawn during trial, cannot be attributed to Respondents, without a further showing that Respondents failed to provide the successor owners with a copy of the Land Use Permit. If these violations were attributable to Respondents, then the duration of the violations would be considered in determining whether any penalty would be warranted.

<u>Actions by Independent Contractors</u>

Even though both S.D. Ireland companies were independent contractors, as were the roofing, drywall, painting, and stone facing contractors, who made specific work decisions without consultation on any day-to-day basis with Respondents= representatives, Respondents remain responsible under the permit and its application to assure that its subcontractors comply with any permit terms and conditions. Therefore, the fact that the work was carried out by a series of subcontractors does not relieve Respondents of responsibility for the violations. Questions as to

whether or when Respondents informed these contractors and subcontractors of the conditions of the permit, or made the hours-of-operation requirements of the permit (or compliance with the permit conditions in general) a condition of their contracts, or otherwise policed their compliance with the permit, may affect the penalty factors, but not whether there was a violation. Similarly, the question of whether Scott Ireland= s > forgetting= about the hours of operation in 2002 was inadvertent, or how > diligently= his company tried to comply with the hours after having been informed of them in 2001, and whether Respondents could or should have had an influence on either of those actions, may be a question for the penalty phase, but does not relieve Respondents from the fact of the violations. Further, the argument that Respondents did not gain an economic benefit from the violations of the hours of operation, that is, that the contract with the S.D. Ireland companies were lump sum contracts, may go to the penalty factors but not to whether there were violations.

Indoor work

Indoor construction or finishing activities that were not audible by the residential neighbors of the construction site were not limited by the construction hour limitation condition, as that condition was imposed to mitigate the noise emanating from the construction of the project and the effect of that noise on the residential neighbors of the construction site. The workers= arrival and departure cannot be considered > construction= ; if it was necessary to limit the noise from the arrival of their vehicles, a condition should have specified their arrival and departure times as well. Accordingly, the drywall > mudding= and hand sanding, plumbing, and indoor painting work that occurred indoors at the duplexes on Lot 36 on September 15, 2001; September 16, 2001; September 22, 2001; September 23, 2001; and October 13, 2001, and generally throughout the fall and winter of 2001-2002, did not amount to violations of the Act 250 Permits.

Work > required by circumstances=

Because the limitation in the permit or application refers to > standard= hours of operation, it would be reasonable to determine whether any of the violations were other than > standard,= that is, required by unusual or unforeseeable circumstances beyond the control of Respondents or their contractors. The two violations for which this argument is suggested are the Saturday cutting of the concrete curbs, which must be done within 24 hours of their having been poured, and the heater running intermittently all night during the January stone facing of the duplex buildings, which must be kept above a certain temperature while curing. However, no evidence was presented to support an argument that either of these violations were unforeseeable or the result of unusual circumstances; that is, why the Friday pouring of the curbs could not have been postponed to the Monday, or why the stone facing could not have been done during a warmer period of the year. Such evidence also may be presented in the penalty phase of this case.

Accordingly, by having construction work done at the project other than during the hours of 7:00 a.m. to 5:00 p.m. Monday through Friday, Respondents have violated their Land Use Permit at least on the following dates and for the following durations, as more fully described above:

Weekday violations: Thursday, May 10, 2001; Monday, June 11, 2001, from 5:00 p.m. to 6:30 p.m.; Tuesday, June 12, 2001, from 5:00 p.m. to 6:15 p.m.; Thursday, June 21, 2001, after 5:00 p.m.; Thursday, June 28, 2001, from 5:00 p.m. to 8 p.m.; Friday, April 19, 2002, from 5:00 p.m. to 6:00 p.m.; one week in January, 2002, (heater cycling on and off all night); Tuesday, April 23, 2002, from 5:00 p.m. to 5:30 p.m.; Wednesday, April 24, 2002, from 5:00 p.m. to 6:50 p.m.; Thursday, April 25, 2002, from 5:00 p.m. to 5:50 p.m.; and Monday May 6, 2002, from 6:30 a.m. to 7:00 a.m.

Weekend violations: Saturday, July 28, 2001 (curb cutting); Saturday, August 11, 2001 (roofing until approximately mid-afternoon); Sunday, August 12, 2001 (roofing from 7:05 a.m. until asked

to stop shortly thereafter); Saturday, April 20, 2002, (pouring concrete from 6:40 a.m. for about a half day); Saturday, April 27, 2002 and Sunday, April 28, 2002 (pounding noise from indoor work audible from neighbor= s property).

Determination of Order (10 V.S.A. ' 8012(c)(3)):

The Administrative Order contains two remedial provisions, both of which fall within 10 V.S.A. ' 8012(b)(3) rather than (b)(2).

The first is entirely prospective: that Respondents A shall not engage in any activity at the Site outside of the hours of operation established@ in Act 250 Permit #4C1060-EB, that is, Monday through Friday between 7 a.m. and 5 p.m.

The second stays the processing of Respondents= pending Act 250 permit applications. Whether the processing of any of Respondents= pending Act 250 applications should be stayed, in turn depends on whether the violations asserted in the Administrative Order are directly related to the activity which is the subject of the other pending applications. As no evidence was presented on what other applications are or were pending, or whether they were directly related to the violations asserted in the present proceedings, there is no basis for a stay and any requirement in the Administrative Order for a stay of processing of permit applications must be vacated.

Accordingly, taking all these factors into account, and based on the findings, conclusions, and reasoning of this decision, it is hereby ORDERED that:

Paragraph A of the April 23, 2002 Administrative Order is AFFIRMED.

Paragraph B of the April 23, 2002 Administrative Order is VACATED.

This decision is not final because issues relating to Paragraph C of the April 23, 2002 Administrative Order will be scheduled for resolution by agreement of the parties in a subsequent phase of this case. Therefore, we will hold a telephone conference to determine the appropriate scheduling of proceedings on whether a monetary penalty is warranted for these violations and, if so, in what amount. 10 V.S.A. ' 8012(b)(4). (See scheduling directive in final paragraph of this order).

Rights of Appeal (10 V.S.A. ' 8012(c)(4) and (5)):

The following warning as to rights of appeal would ordinarily follow a decision of the Court under 10 V.S.A. Chapter 201.

This decision will become final if no appeal is requested within 10 days of receipt of this decision. Respondent and the Environmental Board through the Secretary of the Agency of Natural Resources have a right to appeal this decision. The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to the exceptions in Vermont Rules of Civil Procedure (V.R.C.P.) 76(a)(3) and (d)(5). Within 10 days of receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of this Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court. 10 V.S.A. ' 8013(d). A party may petition the Supreme Court for a stay under the provisions of V.R.C.P. 62 and V.R.A.P. 8.

However, this is not a final appealable order, as the issue of determination of a penalty needs to be either heard by the Court or resolved between the parties. Accordingly, we will hold a brief telephone conference to discuss the scheduling of the remaining phase of the case. Please call each other on receipt of this decision and then call the Clerk of the Court to arrange for the conference, which should be held prior to March 19, 2003. Time is available on March 10, 11, 12, 14 or 18.

Done at Barre, Vermont, this 7th day of March, 2003.


_____
Merideth Wright
Environmental Judge

---

**Footnotes**

[1]   She was also referred to at trial as the Project Coordinator, but to avoid any possibility of confusion with the District Environmental Coordinator, we will use the term Project Manager or her name.

[2]   We note, however, that although both the District Commission and the Environmental Board could have designated both the Allen Road Land Company, Inc. and Mr. Larkin as permit recipients (permittees), neither permit did so. The permittee of the District Commission's permit was the Respondent Company, by its president Respondent Larkin. The permittee of the Environmental Board's permit was Respondent Company, by its attorney Carl H. Lisman, Esq. The Board is, of course, free to review its policies in this respect to avoid similar enforcement issues in the future.